767 So.2d 60 (2000)
Louis GENTRY, Jr., et al.
v.
John Alden MEADE, et al.
Lisa L. Gagliano, et al.
v.
United Services Automobile Association, et al.
Nos. 99-CA-1030, 99-CA-1031.
Court of Appeal of Louisiana, Fourth Circuit.
April 19, 2000.
Writ Denied October 6, 2000.
Edward F. Downing, III, Gauthier, Downing, Labarre, Beiser & Bean Metairie, Louisiana, and Glen A. Woods, New Orleans, Louisiana, Counsel for Plaintiffs/Appellees (Lisa L. Gagliano, et al.).
Timothy G. Schafer, Schafer & Schafer, New Orleans, Louisiana, Counsel for Defendant/Appellant (United Services Automobile Association).
C. Gordon Johnson, Jr., James R. Nieset, Jr., Porteous, Hainkel, Johnson & Sarpy, *61 New Orleans, Louisiana, Counsel for Defendant/Appellant (John Alden Meade).
Court composed of Judge WILLIAM H. BYRNES, III, Judge JOAN BERNARD ARMSTRONG, Judge MICHAEL E. KIRBY.
KIRBY, Judge.
This appeal raises the following question: When a guest passenger is personally protected by layers of primary and excess uninsured/underinsured ("UM") coverage, does La.R.S. 22:1406(D)(1)(c)(ii)(bb)[1] limit him or her to recovering from only one layer of coverage, besides insurance applicable under La.R.S. 22:1406(D)(1)(c)(ii)(aa)? Or, phrased differently, does the anti-stacking provision compel the injured guest passenger to choose only one of his layers of UM coverage, be it the primary, excess or umbrella.
The purpose of the anti-stacking provision was to prevent the stacking of multiple coverages issued on multiple vehicles not involved in the accident, not to deter people from protecting themselves against catastrophic loss by purchasing layers of primary, excess and umbrella UM coverage.[2] Under these facts, we find that LSA-R.S. 22:1406(D)(1)(c) allows a layer of primary and umbrella UM policies, contracted for by an insured, to cover the total limits of damages.

STATEMENT OF THE FACTS
On January 23, 1994, Plaintiff Lisa Gagliano was in an automobile accident riding as a guest passenger in a vehicle owned by Louis Gentry. The Gentry vehicle was hit by John Meade's vehicle, and a jury found Meade to be 100% at fault.
At the time of the accident, the Meade vehicle was insured by a policy of liability insurance issued by USAA. Additionally, liability coverage was provided for John Meade under another USAA policy issued to his mother, with whom he resided at the time. The Gentry vehicle was insured under a policy of insurance issued by State Farm Mutual Automobile Insurance Company with UM limits of $25,000.00. The entire UM limits of the Gentry/State Farm policy were paid to plaintiffs and those parties were dismissed from the lawsuit.
Plaintiff, Lisa Gagliano, was an insured under UM and umbrella UM policies issued by USAA to her father Frank Gagliano. The UM policy carried limits of one hundred thousand dollars ($100,000.00) and the umbrella policy carried limits of one million dollars.
The jury awarded damages in the amount of one million, three hundred thirty-four thousand, two hundred thirty-eight dollars and ninety-nine cents ($1,334,238.99). John Meade and USAA paid the entire $100,000 limits of each of the USAA liability policies covering him, plus interest, into the registry of the court. The jury also awarded the entire limits of the UM and umbrella UM policies issued by USAA to Frank Gagliano under which Lisa Gagliano was a covered person.

LEGAL ANALYSIS
There were two appeals filed from separate trials. They were consolidated because both deal with the central issue of whether or not the trial court correctly interpreted the anti-stacking statute found in LSA-R.S. 22:1406 D(1)(c). The relevant portions of LSA-R.S. 22:1406 D(1)(c) are:
"(c)(i) If the insured has any limits of uninsured motorist coverage in a policy of an automobile liability insurance, in accordance with the terms of Subsection D(1), then such limits of liability shall not be increased when the insured has insurance available to him under more than one uninsured motorist provision or policy; provided, however, *62 that with respect to other insurance available, the policy of insurance or endorsement shall provide the following:
(ii) With respect to bodily injury to an injured party while occupying an automobile not owned by said injured party, resident spouse, or resident relative, the following priorities of recovery under uninsured motorist coverage shall apply:
(aa) The uninsured motorist coverage on the vehicle in which the injured party was an occupant is primary;
(bb) Should that primary uninsured motorist coverage be exhausted due to the extent of the damages, then the injured party may recover as excess from other uninsured motorist coverage available to him. In no instance shall more than one coverage from more than one uninsured motorist policy be available as excess over and above the primary coverage available to the injured occupant."
(Emphasis added.)
A literal reading of the statute tends to support USAA's argument. However, when this provision is read in pari materi[3] with the entire UM statute, USAA's argument is untenable. The legislative purpose of the anti-stacking statute was not to prevent collection under umbrella UM coverage. As noted in one treatise:
"...the primary motivation behind the anti-stacking provision was to overturn the jurisprudence which authorized the stacking of multiple coverages issued on multiple vehicles, whether such multiple vehicles were insured under the same or separate policies. The legislature probably was not contemplating a situation in which the insured purchases several layers of primary and excess UM coverage for the same vehicle. It certainly would be anomalous to mandate UM coverage with each policy providing a layer of automobile liability insurance (as in Dobson) and then to limit the insured to one policy. The public policy behind UM coverage obviously encourages the purchase of excess coverage. Layers of primary and excess UM coverage purchased by a single insured is the equivalent of one policy that provides the total limits of liability and should be treated as such under the anti-stacking provision.[4]"
Under USAA's interpretation of the UM statute, an insured under an umbrella UM policy, such as the Gaglianos, would never receive benefits under that policy while a guest passenger in a non-owned vehicle, despite the fact that Louisiana law requires the umbrella UM insurer to offer that coverage. An insured could never obtain excess UM coverage to provide high limits which would follow him and his family while guest passengers. An insured would have no way of protecting himself or his family from catastrophic harm caused by an uninsured or underinsured motorist while a guest passenger. Instead, the insured would have to hope that his or his family's host-driver has high UM limits.
USAA's position would nullify excess umbrella UM coverage for insureds in Louisiana who desire to have additional layers of coverage protecting them from catastrophic loss when they are occupying non-owned vehicles. As pointed out by the Louisiana Supreme Court in Block v. Reliance Ins. Co., 433 So.2d 1040, 1043 (La. 1983):
"...uninsured motorist coverage is not limited to use of a listed insured automobile by the injured person; the coverage is to protect the insured from damage caused by a negligent uninsured motorist whether the injured insured is occupying an automobile listed in the policy, another automobile owned or unowned, *63 or is occupying no automobile...." (Emphasis added.)
Since the law requires the umbrella UM coverage to be offered, which will provide coverage to an insured who sustains bodily injury while occupying a non-owned vehicle, Southern American Ins. Co. v. Dobson, 441 So.2d 1185 (La.1983)(on rehearing), then it must be understood that the insured will receive those benefits. Since the insured would not ordinarily receive the benefits of the excess umbrella policy until the limits of the primary policy are exhausted then Louisiana law certainly allows payment under both policies.
An umbrella policy cannot exist without a primary policy. As stated in the Gagliano policy:
"You must maintain primary insurance."[5]
An umbrella policy is nothing other than a continuation of the coverage provided by the primary policy. The cause of this contract is for it to work in unison with the primary policy by covering losses above and beyond that of the primary policy, up to the limits of the umbrella policy. Here this is clearly provided for in the Gagliano policy:
"We provide excess liability protection for occurrences covered by primary insurance. We are responsible for the amount of loss above the limit of the applicable primary insurance up to the Policy limit...."[6]
Furthermore it states:
"Your Personal Umbrella Policy applies to occurrences that are covered by primary insurance;...."[7]
The use of the term "primary insurance" by USAA is misleading in this context. In contracts of insurance the primary policy is that policy which ranks ahead of any excess policy, i.e. its proceeds need be exhausted prior to any payment being made from excess or umbrella policies. Here La.R.S. 22:1406(D)(1)(c)(ii)(aa) creates a legal fiction deeming the UM coverage on the vehicle involved in the accident as "primary." This legal fiction obfuscates the terminology of "primary" and "excess" policies as understood in their contractual setting for a passenger riding in a non-owned automobile. 571 So.2d 127, at 129, Lee v. USAA Cas. Ins. Co. of America, (La.1990). No where is it suggested in La.R.S. 22:1406, nor is there any historical basis, that the statute's purpose was to create a legal fiction that would enable an umbrella insurer to defeat the cause of his contract, i.e. to act in unison with the required "contractual" (not "statutory") primary policy to insure against catastrophic loss.
Prior to 1977, an insured covered by two or more UM coverages could cumulate, or "stack" the benefits when his damages exceeded the mandatory minimum coverage. Deane v. McGee, 261 La. 686, 260 So.2d 669 (1972); Graham v. American Casualty Co., 261 La. 85, 259 So.2d 22 (1972). In 1977, La.R.S. 22:1406(D)(1)(c) was amended to prohibit stacking. However, an exception to this general prohibition was created which allowed one policy to be stacked by an injured party occupying a non-owned automobile: (citation of La.R.S. 22:1406 omitted)
* * *
Clearly, the intent behind La.R.S. 22:1406(D)(1)(c) was not to create a comprehensive policy ranking order, but simply to provide a framework within which two policies could be stacked. As a result, a policy which in all respects is contractually primary is deemed by a fiction of law to be statutorily "excess" for purposes of stacking. Such a label does not transform the policy into one of true excess insurance. Rather, the statutory *64 excess policy is only "excess" in the sense that the primary insurance must be exhausted before the statutory excess insurance may be selected. There is no indication the statutory designation was intended to alter in any way the contractual relations between true primary and true excess insurers.(FN4) Simply put, the statute governs stacking only, and does not purport to deal with the overall ranking of insurance policies.
571 So.2d 127, at 129, Lee v. USAA Cas. Ins. Co. of America, (La.1990).
The statute, by labeling policies "primary" or "excess," does not interfere with the cause of an umbrella policy, when that cause is to act as one with a primary policy selected under La.R.S. 22:1406(D)(1)(c)(ii)(bb).
For the aforementioned reasons, we affirm the findings of the trial court.
AFFIRMED.
NOTES
[1] Commonly referred to as the anti-stacking provision.
[2] Louisiana Civil Law Treatise: Insurance Law & Practice, McKenzie-Johnson (1996), Section 125, p. 306.
[3] Statutes must be read in pari materia.. LSA-C.C. art. 17.
[4] Louisiana Civil Law Treatise: Insurance Law & Practice, McKenzie-Johnson (1996), Section 125, p. 306. (Emphasis added.)
[5] Exhibit P-8 at p. 3 of 7.
[6] Idem.
[7] Exhibit P-8, p. 1 of 7.